```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  MIDDLE DISTRICT OF FLORIDA

 3                        TAMPA DIVISION

 4

 5  UNITED STATES OF AMERICA,        )
                                     )
 6          Plaintiff,               )  Criminal Docket
                                     )
 7      vs.                          )  No. 8:23-cr-385-VMC-CPT
                                     )
 8  JUSTIN RYAN CULMO, a/k/a         )
    "Avalanche" a/k/a                )
 9  "TheRealAvalanche,"              )
                                     )
10          Defendant.               )
    _____   )
11

12             Transcript of Sentencing Hearing

13
                     Heard in Courtroom 14B
14      Sam M. Gibbons United States Courthouse
                   801 North Florida Avenue
15                 Tampa, Florida 33602
                   Tuesday - May 20, 2025
16               11:05 p.m. - 1:15 p.m.

17
       BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
18
               UNITED STATES DISTRICT JUDGE
19

20           LORI ANN CECIL VOLLMER, CSR, RPR
                Federal Official Court Reporter
21      Sam M. Gibbons United States Courthouse
            801 North Florida Avenue, Room 1221
22                 Tampa, Florida 33602
            Lori_CecilVollmer@flmd.uscourts.gov
23                   (813) 301-5336

24        Proceedings recorded by machine shorthand
    Transcript produced by computer-assisted transcription
25
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1                          APPEARANCES

2
PRESENT ON BEHALF OF THE PLAINTIFF,
3  THE UNITED STATES OF AMERICA:

4          MS. ABIGAIL KING,
           UNITED STATES ATTORNEY'S OFFICE
5          400 North Tampa Street
           Suite 3200
6          Tampa, Florida 33602
           (813) 274-6000
7          abigail.king@usdoj.gov

8

9
PRESENT ON BEHALF OF THE DEFENDANT,
10  JUSTIN RYAN CULMO:

11         MR. RUSSELL ROSENTHAL,
           FEDERAL PUBLIC DEFENDER'S OFFICE
12         2075 West First Street
           Suite 300
13         Ft. Myers, Florida 33901
           (239) 334-2025
14         russ_rosenthal@fd.org

15

16

17  Also Present:

18  Ms. Tyler Campbell, United States Probation Officer

19  Ms. Brooke Harville, Homeland Security Special Agent

20  Mr. Justin Gaertner, Homeland Security Special Agent

21  Ms. Laura Anderson, Homeland Security Special Agent

22

23

24

25

                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

<pre>
 1                     PROCEEDINGS
 2      (Open court.)
 3      (Defendant present.)
 4      (Court called to order.)
 5           COURT SECURITY OFFICER:  All rise.
 6           This Honorable Court is now in session, the
 7  Honorable Virginia M. Hernandez Covington is presiding.
 8           You may be seated.
 9           THE COURT:  Good morning, everybody.
10           We're here for the sentencing in
11  Case 23-criminal-385, United States versus Justin Ryan Culmo.
12           And I'll begin by having counsel state their
13  appearances.
14           Who do we have for the government?
15           MS. KING:  Good morning, your Honor.
16           Abigail King on behalf of the United States.  I
17  also have at counsel's table with me three special agents
18  involved in the investigation of this case, Special Agent
19  Brooke Harville, Special Agent Laura Anderson and Special Agent
20  Justin Gaertner.  Additionally, there is -- the gallery is
21  filled with family of the victims.
22           THE COURT:  All right.  And what law enforcement
23  agency are the agents with?
24           MS. KING:  Homeland Security.
25           THE COURT:  All three with Homeland Security?
</pre>

1            MS. KING:  Yes.

2            THE COURT:  All right.  Thank you.

3            Mr. Rosenthal?

4            MR. ROSENTHAL:  Good morning, your Honor.

5            Russell Rosenthal from the federal defender's

6    office on behalf Mr. Culmo, and Mr. Culmo is present.

7            THE COURT:  All right.  Thank you.  Welcome.

8            Give me just one moment to log into my computer

9    and we'll get started.

10        (Brief pause.)

11            THE COURT:  Mr. Rosenthal, I know you filed a

12   sentencing memo yesterday that I've had the chance to review.

13   I'm just double-checking there isn't anything else that's

14   recently been -- I know, the motion by the United States to

15   file certain items under seal, and I granted that motion

16   yesterday.

17            So I think those were the last two items that I

18   saw in this case.  I'm just double-checking there isn't

19   anything else that didn't catch my attention.

20            Mr. Rosenthal, was there anything else that you're

21   aware of?

22            MR. ROSENTHAL:  I wasn't aware of the government's

23   motion to seal certain documents.  But we got the government's

24   sentencing memorandum yesterday afternoon.  I believe ours was

25   filed Friday evening.

1           THE COURT:  I think yours was filed Friday.  You're
2    absolutely right on that.  All right.  I think we're all set
3    on that.
4           Again, just give me a minute here to double-check
5    everything, that I'm not missing anything.
6           (Brief pause.)
7           THE COURT:  Okay.  And we also have Ms. Campbell
8    there from probation.
9           Justin Ryan Culmo, on December 5th, 2024, you
10   entered a plea of guilty to Counts 1, 3, 4 of the superseding
11   information charging you with production of child pornography,
12   in violation of Title 18 United States Code Sections 2251(a)
13   and (e), Count 2 of the superseding information --
14          Is that what it was, a superseding information?  I'm
15   just double-checking.
16          MS. KING:  Yes, your Honor.
17          THE COURT:  -- a superseding information charging
18   you with you distribution of child pornography, in violation of
19   Title 18 United States Code Sections 2252(a)(2) and (b)(1),
20   and Count 5 of the superseding information charging you with
21   possession of child pornography, in violation of Title 18
22   United States Code Sections 2252(a)(4)(B) and (b)(2), and to
23   Count 6 of the superseding information charging you with
24   production of child pornography, that is an adapted or modified
25   depiction of a minor, in violation of Title 18 United States

1    Code Section 2252(a)(A)(7).

2            The Court previously accepted your guilty plea and

3    has adjudged you guilty of those offenses.

4            We have now reached the stage in the proceedings

5    where it is my duty to address several questions to you and

6    your attorney and the counsel for the government.

7            Ms. King, do you have any objections to either

8    the factual accuracy of the report or do you wish to make

9    any objections to the probation officer's application of

10   the guidelines?

11           MS. KING:  No, your Honor.

12           THE COURT:  All right.  Thank you.

13           Mr. Rosenthal, have you had the opportunity to

14   read and discuss with Mr. Culmo the presentence report?

15           MR. ROSENTHAL:  Yes, your Honor.

16           THE COURT:  Do you have any objections as to the

17   factual accuracy of the report?

18           MR. ROSENTHAL:  No, your Honor.

19           THE COURT:  Do you wish to make any objections to

20   the probation officer's application of guidelines?

21           MR. ROSENTHAL:  No, your Honor.

22           THE COURT:  Okay.  Thank you very much.

23           All right.  There being no objections to the

24   factual statements and guideline calculations contained in

25   the presentence report, the Court adopts those statements

1  as its findings of fact and determines that the advisory

2  guidelines are:  Total Offense Level is 43, Criminal History

3  Category I, months of imprisonment under the guidelines

4  are 1,740 months imprisonment, five years to life supervised

5  release as to Counts 1 through 6.

6          Although I think eventually certain counts would

7  have to be dismissed, right, Ms. King, as I look through

8  this?

9          MS. KING:  Which counts, your Honor?

10          THE COURT:  Well, let's see.  He entered a guilty

11  plea to Counts 1, 3 and 4, and Count 2 he did enter -- let's

12  see.  Count 2, he's entered a plea to.  So he's entered

13  a plea to everything.  Nothing that needs to be dismissed,

14  correct?

15          MS. KING:  Yes.

16          THE COURT:  Okay.  Just double-checking.

17          So five years to life supervised release as to

18  Counts 1 through 6, restitution to be determined, 50,000

19  to a $500,000 fine, a $600 special assessment, 5,000 per

20  count of the JVTA assessment, and up to 50,000 per count

21  for the AVAA assessment.

22          All right.  Any objections to the Court's findings

23  here with respect to the guidelines calculation, Ms. King?

24          MS. KING:  No, your Honor.

25          THE COURT:  Okay.  Mr. Rosenthal?

```
1              MR. ROSENTHAL:  No, your Honor.

2              THE COURT:  Okay.  So we will proceed.

3              Ms. King, you -- when we began the hearing, you

4    did say that there were victims or victim representatives who

5    were in the courtroom.

6              Do any of these individuals wish to make a

7    statement to the Court?

8              MS. KING:  They do, your Honor.

9              I do have a brief argument, if the Court would be so

10   inclined to hear that.

11             THE COURT:  Well, do you mean before the victims

12   make a statement with respect to the victims, or do you wish

13   to make an argument as to something else?

14             MS. KING:  An argument to the sentence.

15             I also have statements from individuals that have

16   submitted statements that could not be here today.

17             THE COURT:  So normally what I do is I hear the

18   victim impact statement first.

19             MS. KING:  Okay.

20             THE COURT:  And once I finish with the victim impact

21   statement, whether in written form -- and I know you submitted

22   those, I permitted those to be filed under seal -- then we move

23   on to whatever recommendation you would like to make to the

24   Court, and then I would move to Mr. Rosenthal so that he can

25   make his statement.  I know his client submitted his statement
```

1  in written fashion, but certainly free with respect to any

2  other statements that wish to be made.

3       So let's start with the victim statements then.

4       MS. KING:  Your Honor, I do have several victim

5  impact statements that have been submitted to read, so if

6  I may approach the podium to read those, and then I will

7  call up the individuals that are here in person.

8       THE COURT:  All right.

9       MS. KING:  Additionally, I did want to confirm --

10  I know the Court mentioned that the Court reviewed the

11  sentencing memorandum that was received yesterday.  The

12  government did file a sentencing memorandum yesterday in

13  response to the defense sentencing memorandum.  So I just

14  did want to confirm that that was received.

15       THE COURT:  Oh, yeah.  Of course.

16       MS. KING:  Okay.  It had been mentioned that it was

17  the defense sentencing memorandum, so I just wanted to confirm

18  the Court had seen the United States' sentencing memorandum.

19       THE COURT:  Yes, I did --

20       MS. KING:  Okay.

21       THE COURT:  -- because I think that I had to rule

22  on something with respect to filing those documents under seal.

23  But your sentencing memorandum is there at Docket Entry 89.

24       So, yes.

25       MS. KING:  Yes.  Thank you, your Honor.

1          Your Honor, the first statement I have to read has

2    been submitted by Vitalii Lykov.  It is a parent of one of the

3    voyeurism victims, as well as a spouse of one of the voyeurism

4    victims.

5          In our family, I was the first one --

6          THE COURT:  And slow down.  The court reporter

7    is taking down what you're being -- what's being said.  We want

8    to make certain that this is taken down accurately.

9          MS. KING:  Yes, your Honor.

10          In our family, I was the first one to find out about

11   my son as the victim of a crime.  I received a call from

12   Agent Brooke Harville.  She started talking something about my

13   son.  I first thought it was some kind of scam.  Then she said

14   my address and my son's name.  It made me nervous.

15          She said they have my son's pictures that they found

16   somewhere online and they wanted to talk to me.  I didn't know

17   what to think at the moment.

18          I agreed to meet with the agents.  I called my wife

19   to let her know what's going on and to see if she received any

20   calls at all.  She literally lost it right there.  She couldn't

21   understand what was happening.  I decided to call the school

22   to see if my son was there.  I was worried like never before

23   in my life, as I wasn't able to make up my mind in light of all

24   of this new information and fit it into the reality.

25          At that moment, I couldn't even remember the name of

1    my son's school and how to find it.  When I finally called the

2    school, they assured me that my son was in his classroom and

3    never left the school.

4          Soon after, I met with the agent.  I arrived a

5    little early.  I was sitting in the truck waiting for somebody

6    unknown to me to show up.  Then the car pulled up.

7          Agent Harville got out of the car and immediately

8    waved to me.  She knew what car I drive and what I looked

9    like.  At this point I was sure I was not being scammed

10   and the agents are real.  I started worrying even more now

11   as all of this was something very serious.

12         The agent showed me pictures of my son that were

13   found online.  As soon as I saw them, I couldn't think about

14   anything.  The agent was talking to me, but everything she was

15   saying sounded just like noise to me.  I just couldn't perceive

16   information, and I felt like my body was shaking and it felt

17   like it was very cold.  My brain was like in the haze.

18   Thoughts were mixing up.  And I just couldn't believe something

19   like this was happening to my family.

20         I called my wife to tell her what's going on.  She

21   started crying.  She went through the biggest shock and stress

22   ever.  She was supposed to pick up our son at school that day,

23   but she couldn't drive.  I took off and went to pick up our

24   son.

25         I could not think about anything else.  My mind was

1  completely taken by all those thoughts about pictures and

2  videos of my naked son somewhere online, and there are other

3  people who are looking for such content.  It was making me sick

4  and mad simultaneously.

5          Then other scary thoughts settled in my mind.  I

6  don't know where all those photos and videos went.  What if

7  this guy has something to do with kidnaping.  Are we safe?  Is

8  anyone watching us?  Even Agent Harville told me there was

9  nothing like this, I still could not get rid of this thought.

10 Even now, I still catch myself thinking about it, especially

11 when being in some new place with my son.

12         So this day has split our life into before and

13 after.

14         The next day we requested a meeting with the

15 principal, our son's teacher and social worker at the school,

16 as we both felt very unsafe and wanted to make sure that

17 school is a safe place to be for our son.

18         Several days later, we had our son meet with a

19 psychiatrist who works with the federal agency to see if he was

20 in contact with the accused.  I was afraid to find out new

21 details.

22         It happened to be that my wife was captured on the

23 video too.  This all made me feel very bad.  I felt like there

24 was no way for me to protect my family.

25         My son's and wife's videos and pictures were found

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1 online, and who knows what was the purposes of all of that.

2 What are they going to do with these pictures?  The thought

3 of human trafficking wasn't leaving my mind, and it was

4 something I never wanted to mention to my wife knowing how

5 difficult it is for her that she has to go through

6 psychotherapy.

7        I am still finding myself looking for hidden cameras

8 in the bathrooms ever since, anywhere I am, hotels, gas

9 stations, stores, friend's houses.  I simply developed

10 paranoia.  Now, I want to know and feel my family is safe.

11        I believe this man should be behind bars for life

12 and should never be around other people ever.  Knowing this

13 will make me feel safer.  And still it is breaking my heart and

14 will stay in my memory forever.

15        The next statement is from a mother of a victim and

16 she is as well a victim of the voyeurism.  Her name is Olesya

17 Zheleznikova.

18        I won't have the right words to describe my emotions

19 I went through and am still feeling.  The moment I found out

20 about this, I think I lost several years of my life.  Since

21 that day, I have life before and after.

22        My husband called me and told me that federal agents

23 called him about our son, and the first thought was that it's a

24 scam.  Then he called me again and told me that he's on the way

25 to meet federal agents, and after that I lost it.

1    We called the school to make sure our son wasn't

2    kidnapped.  I couldn't stand on my feet because of what

3    happened.  I still remember exactly what I felt.  I would never

4    wish this to anybody.  I couldn't even drive my car to get back

5    home.  My hands were shaking, and my friend who was with me at

6    that moment helped me and gave me a ride.

7    I locked the house right away and was so scared.

8    I didn't want to go outside.  I didn't feel safe.  I couldn't

9    talk.  I was hysterically crying and screaming.  I still feel

10   lost.

11   The next day we found out that -- we made a meeting

12   at the school with the principal, our teacher and social

13   worker.  We were asking about security, who, how and when can

14   come on school territory.  I just didn't feel safe anymore.

15   I also believe that anxiety affects my little boy,

16   because he is scared and doesn't feel comfortable to be without

17   me or his father.

18   Eventually, we ended up home schooling him.  I

19   developed panic attacks.  I was ready to go to the emergency

20   room once because I couldn't breathe and I thought I had a

21   heart attack.  It was panic.  My anxiety is above the sky

22   sometimes, especially when I am somewhere in an unknown place

23   with my husband.

24   I also developed fear to men.  If I see a man with

25   a kid only, the first thought is always, is he a parent or a

1    relative or a predator.  I still have nights when I am waking

2    up in the middle of the night with tears on my face.

3              I can't stop thinking about my little boy being

4    captured on the video naked, and only God knows where all those

5    videos are now with all these innocent kids.

6              I developed paranoia also after I saw myself being

7    captured on the video as well.  I felt like I was naked in

8    front of the whole world.  I don't even want to think how many

9    people all over the world saw me and is still watching.

10             While I'm writing this now, my heart starts beating

11   faster and anxiety gets me.  I don't know the right words right

12   now.  I am devastated.  I feel like someone is always watching

13   me, and it doesn't matter how hard I am trying to not think

14   about it, it doesn't work.  All those thoughts coming back

15   again and again.  Inside me I am screaming out of my lungs.

16             I am now going through psychotherapy and I am on

17   homeopathic medication as well.  It's helping me to go to sleep

18   and dealing with anxiety.

19             Thank God our son doesn't really understand what

20   happened because he is little and I hope he won't remember

21   this.  But me and my husband are going to carry this pain for

22   the rest of our lives.

23             I really appreciate my doctor.  I don't know how I

24   would live without her therapy.

25             This evil should be behind bars for the rest of his

1  life for what he did.  He can't be even close to kids.  Even

2  just thinking of him makes me sick to my stomach.  I am writing

3  now and crying.  I feel like I am back to the day when I found

4  out.

5          Please protect our kids from this evil.  The only

6  way to understand what we feel as parents as myself being naked

7  on the video is to imagine your kids and yourself being in our

8  place.

9          The next statement is from an individual that is a

10  parent of one of the victims.  His name is A.J. Weldon.

11          Your Honor, my name is A.J. Weldon, and I am the

12  father of a beautiful, innocent child whose life was forever

13  changed by the actions of the defendant Justin Culmo.

14          I never imagined I would be writing about the

15  unimaginable pain and trauma my child has endured.  As a

16  father, you do everything you can to protect your child,

17  but nothing prepares you for the moment when you find out

18  someone has taken advantage of your child's trust, their

19  vulnerability, and shattered their sense of safety in the

20  world.

21          Since the abuse, my child is not the same.  The

22  lights in their eyes have dimmed.  They wake up in the night

23  crying.  They ask questions no child should ever have to ask.

24  Their laughter is no longer carefree.  It's cautious, as the

25  joy is something they're no longer sure they're allowed to

1    feel.

2            I spent countless hours in therapy trying to help

3    my daughter rebuild a sense of safety, trying to reassure them

4    that the world is not all darkness, but the truth is, this has

5    affected every part of our lives.

6            Emotionally, we're devastated.  As a parent, it's

7    heartbreaking to watch your child suffer and know that there

8    is no quick fix, no way to take their pain away.  And on top of

9    the emotional toll, the financial burden has been overwhelming.

10   Therapy sessions, medical visits, missed work, transportation

11   costs.  It adds up quickly.  We've drained our savings, taken

12   on debt, and constantly worry about how we'll afford the care

13   our child needs and deserves, and the legal bills of battling

14   with her mother to make sure my daughter is getting the best

15   care she can.  It feels cruel to have to choose between paying

16   bills, letting my kid enjoy life, and paying for your child's

17   healing.

18           This abuse didn't just steal my child's innocence.

19   It robbed us of our stability, our peace and our future plans.

20   We are still trying to pick up the pieces, still trying to help

21   my daughter believe that the world can be safe again.

22           The trauma doesn't end with the abuse.  It lives

23   with us every day.  It echoes through every moment

24   of silence, every anxious look, every tear.

25           I am asking this court to understand that what

1  happened here has life-long consequences.  My child deserves

2  justice.  My family deserves justice.  We need to know that

3  the person who caused this harm will be held accountable not

4  just for what they did, but for everything they took from us.

5          Thank you for listening to my pain and for standing

6  with me in seeking justice.

7          Your Honor, this statement is from the father of

8  Victim 1.

9          Thank you for allowing me to enter this statement.

10          On the day we became aware that our daughter was a

11  victim of sexual abuse was the worst day of my life and has

12  disrupted every day since, and I am sure will continue for the

13  rest of my life.

14          At that time feelings of anger, shock, fear,

15  depression, isolation, disgust and frustration took over,

16  and to this day those feelings continue in some combination.

17          We immediately pulled back from everyone we knew

18  while this investigation went on.  During this time we would

19  not allow anyone over, including family.  We have kept our

20  circle extremely small, and this has impacted our relationships

21  with everyone.

22          I became acquainted with Justin through work and

23  we became friends over time, mostly around automotives, which

24  we both enjoy.  But "friend" is the absolute wrong word.  He

25  was never a friend.

1              I realize now that he was and is a child predator.

2    Justin hid his intentions very well and was very calculated

3    in what he did.  What I know of him now is not how I knew him

4    then.  He is a monster, but he was able to fool us enough to

5    gain our trust to be allowed into our home where he was able

6    to sneak time in order to abuse our daughter.

7              My daughter, my most precious creation, the one

8    thing as a father that I'm supposed to protect for as long

9    as I live, I failed at, and I will carry that for the rest

10   of my days.

11             Before I could have a talk with her to warn her of

12   the dangers of this world, evil found her.  So young that she

13   couldn't speak to me about what happened because she was too

14   young to talk.  Who does such an evil and atrocious act to

15   someone so precious and innocent as a toddler?

16             Justin Culmo is a predator, one who preys on the

17   most vulnerable part of our society.  He is calculating and

18   conniving and devoid of human emotion.  How else could he

19   do such horrible things?

20             Any attempts by his defense or by himself to show

21   remorse should be considered with extreme caution.  He is not

22   sorry of his actions, only that he has been caught.  In my

23   mind, there is no rehabilitation for such monstrous crimes.  In

24   my opinion, he represents the absolute worst part of humanity.

25   His actions highlight the continuing need to protect our

1   children and society from those like him.

2          We as parents have not yet told our daughter what

3   happened to her and are awaiting sentencing to speak with her.

4   I ask that when it is time to have this conversation, I can

5   tell her the person that committed the abuse will never, ever

6   be able to find her and hurt her or anyone ever again.  This

7   fact should be highlighted.  The trauma that this will cause

8   her and the treatments that she will need in her life are

9   unknown at this time, but could understandably be life-long in

10  nature.

11         She was one-and-a-half years old at the time of the

12  abuse, an innocent child completely unable to defend herself.

13  The images that he produced, from my understanding, will exist

14  on the dark web forever and cannot be taken down due to current

15  laws.  Why as a society do we allow anyplace for child abuse

16  images to exist and to be shared?  Why can't we protect all

17  children and make laws to remove all images of abuse from the

18  web and dark web, or make the punishment so hash and extreme

19  that they deter these crimes from happening all together?

20         We moved back to Florida and soon our lives changed

21  from this case.  Every day I drive to work, I'm reminded of

22  Justin.  I work on equipment he worked on and with people that

23  he worked with.  This affects me daily and is a struggle.  A

24  job that I loved so much is tainted by what I carry with me

25  every day.  The scars he has placed on me and my family are

1  deep and may never heal.

2          I ask that you consider the maximum penalty to be

3  handed to Justin for his actions, for giving life-long trauma

4  to my family, for the daily reminders we have to live with,

5  knowing every day for the rest of my life that I failed as a

6  father to protect my daughter, for the images he placed

7  on the dark web that cannot be removed and will exist forever.

8  I ask that he receives the maximum punishment for his crimes

9  and spends the rest of his life in prison.

10          One last thought, the images he keeps in his mind

11  will remain as long as he is alive.  So in that regard, and

12  in my opinion, Justin should receive the death penalty for

13  his actions so that any child abuse images he has in

14  his memory of not only my daughter, but all of the victims,

15  cease to exist.  Only in death will those images be erased.

16          Thank you for allowing me to share my thoughts.

17          Your Honor, the last statement that I have to read

18  before I will call members of the gallery is a statement from

19  the mother of Victim 1.

20          This is by far the hardest thing I have ever had

21  to put into words.  How can I write every emotion or feeling

22  my family has experienced since finding out what Justin Culmo

23  has done to our daughter, and help to convince you to give

24  Justin the maximum sentence possible to protect her and the

25  other children involved?  Not to mention any future victims if

1   he were given the opportunity to be free to commit these

2   horrendous crimes again.

3           This man is a calculated predator who knew exactly

4   what he was doing when he befriended my husband, which we

5   now realize was just a means to have access to our daughter.

6           July 2023 broke our family and our trust of everyone

7   around us.

8           I had to identify images of our daughter at less

9   than two years old, and then was informed that she had been

10  the victim of child pornography and her images are circulating

11  the dark web.  This broke our family.  How could someone do

12  this to our baby?

13          Then to realize the monster capable of this was

14  someone who we let into our home as what my husband thought was

15  a friend, all while hiding his true intentions in harming our

16  innocent child.

17          This man is a calculated predator.  He managed to

18  abuse her in such stolen moments of time in our home while at

19  least my husband or both of us were home.  He had a plan.  He

20  preyed on our child with intent.

21          The way in which he committed these crimes and then

22  boasted about them on the web later leads me to believe that

23  it will never be safe for him to be anywhere except behind bars

24  and hopefully without internet access.

25          I live every day in fear for my child.  I fear that

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1    some monster who downloaded her image is looking for her to

2    hurt her.  I fear that she will not be okay when she finds out

3    this has happened to her.  I fear her future relationships will

4    be hard for her as a result of being a victim of such a

5    horrific crime.  I fear so many things for this innocent child

6    of mine.

7              My husband and I are suffering with guilt,

8    depression, rage, anxiety and hopelessness every day knowing

9    we allowed this monster into our home.  Now, we trust no one.

10   Our friends and family don't know why we have pulled back.

11   Our daughter, now 14, doesn't understand why she can't have

12   sleep-overs and social media like her friends.  She was just

13   about a year-and-a-half old when this began for her and for

14   the time being has no memory of it.

15             Her father and I are tasked with knowing one day

16   we are going to have to share this with her, that she was

17   abused by someone we let into our home, and that these

18   disgusting images are possibly on the internet forever.  We

19   are going to have to share this trauma with her and break

20   her heart the way it has broken ours.

21             Because we are choosing to shield her from this

22   for the time being, she is not going to be offered any

23   restitution for future therapy or treatment if needed.  The

24   best restitution for her would be that when the time comes

25   to tell her, we can let her know that the monster who hurt

1   her is locked away forever and can't ever harm her again.

2          THE COURT:  These are all from parents who are

3   either not here today or are here today, but prefer not to

4   speak to the Court, is that it?

5          MS. KING:  Your Honor, those are from parents that

6   were unable to make it here today.

7          THE COURT:  Okay.

8          MS. KING:  There additionally were statements that

9   were submitted to the Court that the Court allowed to be filed

10  under seal.  There are at least two parents here that do plan

11  to read those statements.

12         THE COURT:  Thank you.

13         MS. KING:  Your Honor, at this time the United

14  States would call forward Jared Buchman.

15         THE COURT:  All right.  Mr. Buchman, if you could

16  please come forward and just stand at the microphone.  And

17  I'm just going to ask you to spell your last name, please.

18         Thank you, Mr. Buchman.

19         And just pull that microphone up so that everybody

20  could hear you, Mr. Buchman.  Thank you.  That's perfect.

21  Thank you.

22         MR. BUCHMAN:  Thank you, your Honor, Jared Buchman,

23  B-U-C-H-M-A-N.

24         THE COURT:  Yes, sir.  Go ahead.

25         MR. BUCHMAN:  Okay.  My name is Jared Buchman,

1  former city council member from the city of Baltimore.  I am
2  here today because I once considered the defendant, a man whose
3  name I can no longer state, a friend.

4          During a difficult period in his life, particularly
5  his divorce, I tried to offer him support and comfort, as any
6  friend would.  I never could imagine that he was capable of
7  the actions described in the filing before the Court.

8          When I first read the complaint from the FBI on
9  September 27th, I physically felt sick.  The shear depravity
10  of what was detailed in that report was beyond anything I
11  could have imagined.  I was overcome with a deep sense of
12  disgust, anger and sorrow, not only for the innocent children
13  who suffered, but also for the ripple effect of the pain
14  that spread to the families of everyone who once knew the
15  defendant.

16         After finding the case, I knew immediately that
17  Melissa could not read this alone.  No one should have to
18  process such horrific information in isolation.  I made sure
19  she was surrounded by close family and friends before she faced
20  the reality of what was in those pages.  Even with support,
21  nothing can truly prepare a person for the weight of such evil.

22         What the defendant has done to the victims, their
23  families and our community is despicable.  The pain and
24  suffering he has caused cannot be justified or excused.  His
25  actions have not only inflicted deep wounds on the victims

1    and their loved ones, but has also driven immense disruption,

2    confusion and anger within our community.

3            People who once felt safe now question the world

4    around them.  Trust has been shattered.  At the very fabric of

5    what makes a community strong, its sense of security and unity

6    has been torn apart.

7            No one who has committed such heinous acts against

8    innocent children should ever be allowed back into the

9    community.  The damage inflicted on the victims is life-long,

10   and the thought of allowing somebody who is capable of such

11   cruelty to be given the opportunity to harm again is simply

12   unacceptable.

13           Communities should be places of safety, trust and

14   protection, especially for our children.  A person who has

15   so egregiously violated that trust has no place amongst law

16   abiding citizens.

17           The defendant's choices have left lasting scars,

18   not only on those he directly harmed, but an entire community

19   that is now grappling with the reality of his betrayal.  The

20   anger and outrage felt by so many are justified because his

21   actions are unforgivable.  My heart goes out to those who have

22   been truly hurt by his crimes, and I stand in full support of

23   them as they seek justice.

24           While I once knew the defendant in a different

25   light, the person responsible for these crimes is not someone

1    I recognize.

2              There must be accountability for what he has done.

3    I trust this Court to impose a sentence that reflects the

4    gravity of his actions, ensures the protection of the public

5    and delivers justice for the victims.

6              Thank you.

7              THE COURT:  All right.  Thank you very much.

8              MS. KING:  Your Honor, the next individual the

9    government calls is Melissa O'Dougherty.

10             THE COURT:  All right.  Ms. O'Dougherty, please come

11   forward.

12             I know I've seen the spelling of your name in the

13   information that I've previously been provided, but why don't

14   you go ahead and spell it, please.

15             MS. O'DOUGHERTY:  Thank you.

16             My name is Melissa O'Dougherty, O-D-O-U-G-H-E-R-T-Y.

17             THE COURT:  You may proceed, Ms. O'Dougherty.

18             MS. O'DOUGHERTY:  Thank you.

19             My name is Melissa O'Dougherty, formerly known

20   as Culmo.

21             These are my experiences.

22             I was married to the defendant -- I can't even say

23   his name -- for almost seven years, six years and 359 days to

24   be exact.

25             During that time, I experienced financial, emotional

28

1  and psychological abuse, and my children experienced repeated
2  sexual and physical abuse.
3          Justin is methodical.  His actions were thought-out
4  and preplanned.  He acted in ways that would put him in the
5  best light to have access to me, my children and my friends
6  and family.  He would do exactly what was needed to be done to
7  meet his goal of having access to young children.
8          When we first met he pretended to be the person I
9  wanted him to be.  He knew that by doing this, I would let my
10 guard down.  Then he started to break me down, or at least he
11 tried.  I'm a lot stronger than he thinks I am.  He started
12 slowly.  It was insidious, and he made me question my sanity
13 and what was actually happening.  But then it started to
14 accelerate, particularly after we got married and I became
15 pregnant.
16         I had to be home when he got home from work.  He
17 placed cameras inside and outside of my car for my protection,
18 he would say, and also inside and outside of our home.  He
19 knew where I was at all times.  I believe he also had me
20 tracked on our cell phones.
21         I was constantly monitored.  He had instant alerts
22 of all of the credit cards on his phone, so if I spent money,
23 he instantly knew, and if he didn't agree with it, I would be
24 berated and questioned.  He would use intimidation and his size
25 to keep me in line.  And I found over the years it was easier

1  to just keep the peace than to fight it out.

2            I tried to leave the marriage on several occasions.

3  The first time was right after our daughter was born.  He knew

4  I did not want to be from a broken home and have my child not

5  have both of her parents, and he corrected his behavior just

6  enough so I would come back.  And that became the pattern.  He

7  would mess up, I would threaten, he would correct just enough.

8            He made sure to isolate me and the girls from our

9  family and our friends.  He would do things without my

10  knowledge, particularly on social media, and then he would

11  hide it from me so there were times I didn't even know what

12  was happening.  This caused issues with my family, including

13  my brother and my sister-in-law.

14            When confronted about these situations, he took

15  zero accountability, took zero responsibility for his actions

16  and he would blame others.  He specifically told me once that

17  he will never say sorry to me so I might as well get over it

18  now.

19            Because I didn't want to further the conflict and

20  make things worse, I would not question any of the stories

21  that he would tell me.

22            He participated in marriage counseling for over two

23  years and also in individual counseling for about a year.  He

24  did these things to keep me in the marriage so that he could

25  continue to have access to my children and their friends.

1    Justin would blame me for all of the issues in

2  our marriage and would not take any accountability or

3  responsibility.  These sessions would often end in fights later

4  when we would get home.

5    When I decided to finally leave, after many times

6  of threatening, I had to enact a safety plan with my therapist

7  because I was afraid that he would hurt or possibly kill me or

8  himself.  I had to hide weapons, including knives.  I had to

9  remove his gun from our house.  I drove separately and I went

10  a different way home so that he couldn't use the car and drive

11  me off the bridge like he would threaten to do.

12    After his arrest, he continued the financial and

13  psychological abuse through the court and divorce proceedings.

14  He refused to agree, and the divorce had to be decided by the

15  judge for every single decision.

16    He allowed his parents to go into our shared house

17  and take items.  He also had his parents take items from his

18  work after he was terminated.  I am not sure what they took

19  because nothing has ever been told to me.

20    He refused until recently to give up his parental

21  rights to my daughter.  At first, he would only agree to give

22  up his parental rights if I allowed his mother visitation.

23  She has been supportive of Justin throughout this entire

24  proceeding and also while he has been incarcerated.

25    It is my opinion.  Based on her previous actions.

1  that she would provide him with photographs and video

2  recordings and access to my daughter, even though he is

3  prohibited from having any access to her.

4          His goal is to agitate me and to make sure that he

5  wins under any cost.  His goal has never been what is best for

6  Rose.

7          Our divorce was finally finalized in April of this

8  year.  He refused to agree on property and the division of

9  assets.  His goal was to have control over the situation

10 even while incarcerated.  He is not remorseful.  He is vengeful

11 and full of rage.

12         Because of his actions during the past year I have

13 had to spend tens of thousands of dollars on lawyer fees,

14 court fees, and also to fight for custody of my older child.

15 This has made it difficult for me to care for my children

16 because I have to work multiple jobs.

17         During our -- the marriage, I have been diagnosed

18 with two chronic medical conditions that he continues to

19 exacerbate because of the constant stress that I am under.

20 I now have to deal with these for the rest of my life.

21         My daughters struggle with their emotions and

22 require constant reassurance that Justin is not able to

23 see or hear them.  He used to use the Alexa to come over so

24 that we always knew he was there.  They continue to suffer

25 daily.

1          Eliza struggles to be in public places, and

2    she often has to leave restaurants or busy locations.  She

3    struggles with panic attacks and prefers to be at home.  She

4    is afraid to go to her friends' houses.  She struggles with

5    trusting new people.  She has difficulty sleeping and requires

6    constant reassurance that no one is going to hurt her or walk

7    into her room while she is asleep.  She locks her door at night

8    and she is afraid of people taking her photo in public.

9          Rose is unable to sleep independently.  She has

10   constant nightmares about Justin getting out and stealing her.

11   She's afraid of Justin's mother.  She also struggles with

12   going to the bathroom and has constant accidents at home and

13   at school.  She is afraid that there are hidden cameras in

14   our house and in public.  She is afraid of any Alexa or Google

15   home devices that she might see out and about.  She is afraid

16   that Justin can hear her and see her.  She is jumpy and unable

17   to be alone at any time.  She tells people that she doesn't

18   have a dad because he's dead.  It's easier for him to be

19   dead than a child molester.  She questions what will happen to

20   her if I die or go away without hesitation.  She requires

21   constant reassurance that I will not leave her.

22         Justin is smarter than he lets people know.  He is

23   calculating, cunning and highly manipulative.  He knows how

24   to read people and can exploit their weaknesses to his

25   advantage.  He can morph into what people want him to be,

1  even though he struggles with maintaining that facade for

2  long periods of time.

3          He wears people down with long lectures and

4  grandiose behavior where he thinks he is superior to everybody

5  else.  He lures his victims and grooms their parents so he is

6  trusted.  He lies without question or hesitation.  His only

7  goal was to exploit and abuse children.  If given the

8  opportunity, he will continue this behavior.

9          After his arrest, I found out that he was having

10 sleep-overs with Rose and her friends after I moved out of the

11 residence.  He had tricked these parents into thinking I was

12 abusive and manipulative while he was abusing their children.

13         I also found out that he was spreading rumors about

14 me to our neighbors and friends, none of which were true.  He

15 said these things to tarnish my reputation within the

16 community, the community in which I was considered an

17 upstanding citizen.

18         I was active in city council and city events.  I had

19 started with a neighbor a nonprofit where we were raising money

20 to help enact Safe Routes to School, and my daughter Eliza had

21 started a Walking School Bus.

22         When news of Justin's arrest became public, I lost

23 all of it.  I lost my community.  I lost my friends.  My kids

24 lost their safe home, or what I thought was safe.  I was called

25 a ring leader.  I was called a pedophile.  I was called his

1   accomplice.  This was posted online, and everybody in my

2   community jumped on that bandwagon.

3           The news and details from the federal complaint

4   were copied into the Tampa Bay Times, Forbes Magazine and

5   the New York Post with Justin's full name, which is not very

6   common, and also saying that my children were his victims.

7   I had to read that more than one time.

8           Because of the notoriety of this case and my

9   public persona, we had to leave our home and community.  I

10  had to allow my brother and sister-in-law to take care of

11  Rose, and I had allow Eliza's father to care for her.  And

12  as you now know, based on this statement, we are now embroiled

13  in a custody battle where I have to pay even more court fees

14  and guardian ad litem fees, and I have to continue this process

15  because of the direct actions that the defendant has done to

16  our family.

17          He will do whatever he needs to accomplish his

18  goals.  He is a danger to the community and he will reoffend if

19  given the opportunity.  I am asking that he is given the

20  maximum sentence of life imprisonment.

21          Thank you.

22          THE COURT:  Thank you.

23          MS. KING:  Your Honor, the next individual that

24  wishes to speak is Ginger Tatarzewski.

25          THE COURT:  Thank you.

1          If you could also state your name and spell your

2    last name, please.

3          MS. TATARZEWSKI:  Virginia Ginger Tatarzewski.

4    That's T-A-T-A-R-Z-E-W-S-K-I.

5          Your Honor, thank you for hearing us all today in

6    this matter before the Court.  My name is Ginger Tatarzewski.

7    I live at 303 Park Boulevard in Oldsmar, next door to the

8    former home of Justin Culmo and Melissa O'Dougherty.  I moved

9    in about one month prior to Mr. Culmo moving in over 16 years

10   ago.  So for 16 years, he was my neighbor.

11         I'm here to speak today in the capacity of a

12   neighbor and as a grandmother.  My adult children were friends

13   with Mr. Culmo, as was I, and over the years, we all visited.

14   All of my grandchildren were in his home at one time or

15   another.  And we became good friends.

16         We were also very happy when Justin met Melissa

17   and her beautiful daughter, Eliza, and they were soon married.

18   Melissa quickly became a mainstay of the neighborhood.  Soon

19   after, they celebrated the birth of a daughter, Rosie.

20         These two girls are, and always were, the most

21   beautiful girls in every respect.  I think about looking at

22   their innocent faces, celebrating holidays with them, playing

23   outside, going to the park and walking to school.  These

24   girls were/are a treasure to be treated with the greatest

25   of care.  Not a commodity to be sold, used and abused.  For it

1  is the responsibility of adults, parents, grandparents,

2  friends, neighbors to care for each other and protect the most

3  innocent among us.

4        There are two major purposes in our criminal

5  justice system, in my opinion; the pursuit of justice and the

6  protection of the innocent.  Neither of these purposes can be

7  met if anything less than the maximum available sentence under

8  law is administered today.

9        Mr. Culmo has committed one of the most unspeakable

10 crimes there is, using and abusing children.  Among them, his

11 own children.  This should never be dealt with except with the

12 full power of the law.  Nothing else will do.

13       These girls will forever be affected by the events

14 that happened to them, especially Rosie, the youngest.  His

15 selfish, sick actions are unforgivable and disgusting.  He

16 fooled us all.  I guess that's part of the MO of a sexual

17 predator.

18       I guess it must be some sort of game to them.

19 The currency of the game, however, is human lives and human

20 emotions.  Human lives of people who knew and trusted this

21 monster, and anyone involved in this case knows exactly what

22 I mean, the long sleepless nights -- excuse me -- the bitter

23 anguish of all of the adults involved, and many we've heard

24 from today, because we all wonder what we could have done and

25 why didn't we see this?  If only.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1            And I would like to finish, your Honor, with your

2      indulgence, of thanking all of the court people and the people

3      of Homeland Security who deal with child crimes, because you

4      guys are our front line, and we thank you.  Thanks.

5            THE COURT:  Thank you.

6            Ms. King?

7            MS. KING:  Yes, your Honor.

8            Adrienne O'Dougherty will now be speaking.

9            MS. ADRIENNE O'DOUGHERTY:  Thank you, your Honor.

10           I'm reading statements on behalf of my daughters.

11     These are their words.  They are now teenagers.

12           THE COURT:  All right.  And if you could just move

13     that microphone.  And before you begin, just state your name

14     again.

15           MS. ADRIENNE O'DOUGHERTY:  My name is Adrienne

16     O'Dougherty, O-D-O-U-G-H-E-R-T-Y.

17           THE COURT:  Thank you.

18           MS. ADRIENNE O'DOUGHERTY:  This horrible, disgusting

19     man, Justin Culmo, has ruined so many things for us.  I have

20     a few vivid memories of inappropriate touching and comments

21     he would say, like he liked my dress or how I styled my hair a

22     certain way.  I've thrown out my clothes, grew out my hair.

23     I want noth- -- I want to be nothing that he liked about me.

24     He's made me question, why me?  What did I do to deserve this?

25     I was just little, just a kid.  I was vulnerable and hadn't

1    done anything.  Little me didn't deserve this, but he made

2    victims out of little kids.  It was his thing.

3              I don't trust.  I can't sit in comfort knowing what

4    I've been through.  But this is not going to determine the rest

5    of my life.  It will determine his.

6              I have been looking back on many times I should have

7    noticed something about the way he acted, the things he did and

8    his stupid camera he carried everywhere.  The fact that this

9    man would put a camera in the bathroom of his own home amazes

10   me.

11             This man deserves nothing but the worst.  I hope and

12   pray he never gets the chance to leave jail and live a free

13   life again after what he put me and my family through.  He

14   should never be able to see another child.  And all I want in

15   life is to see justice served.  He is a horrible, disgusting

16   man who deserves hell.

17             The second statement:  The day I went to the

18   detective, I expected something else, not that I would see

19   pictures of myself.  I knew I was likely a victim, but now it

20   felt real.  I felt abused and taken advantage of.

21             Justin Culmo is a terrible man, and I have seen the

22   affects he has had on my family, and I can imagine the affect

23   his twisted ways have had on other victims.  I have watched

24   Rosalee, Eliza and my whole family struggle.  Not only did

25   their lives drastically change, but so did their happiness.

1   There is a spark that we'll never see again, and God forbid

2   that awful man sees a child again.

3              Thank you.

4              THE COURT:  All right.  Thank you.

5              MS. KING:  Your Honor, if I may just have one

6   moment.

7              THE COURT:  You may.

8       (Brief pause.)

9              MS. KING:  Your Honor, at this time that is the

10  end of the victim and witness statements the government has

11  to present today.

12             THE COURT:  All right.  Thank you.

13             So what we'll do then is move forward to having

14  you tell me what you think an appropriate sentence for

15  Mr. Culmo would be.

16             MS. KING:  Your Honor, may I approach the podium?

17             THE COURT:  Yes, you may.

18             MS. KING:  Thank you.

19             THE COURT:  As I said, the guidelines call for

20  1,740 months.  I -- I don't believe I have ever seen the

21  guidelines call for a sentence that high in my experience.

22             What's a little bit challenging is that a lifetime

23  sentence in some ways is considered a harsher sentence, I'll

24  just say that, rather than 1,740 months.  I've had cases where

25  the guidelines call for, let's just say, 40 years or 50 years.

1        And the victims have come forward and have asked

2   for a sentence of a lifetime, and I've imposed a sentence of

3   lifetime, I'll just say honestly, on cases that are not as

4   substantial as this case.

5        So obviously I -- I will wait to decide until I hear

6   from Mr. Rosenthal and until I hear from his client as to what

7   an appropriate sentence is.  But I don't know what your

8   position is with respect to that, as to what an appropriate

9   sentence is.

10        I think in your memo you did say a lifetime

11   sentence, which even though probation has said 1,740 months,

12   certain a lifetime sentence is something within the guidelines

13   here, is it not Ms. Campbell?

14        PROBATION OFFICER CAMPBELL:  That's correct, your

15   Honor.

16        THE COURT:  So, you know, regardless of somebody's

17   age, 1,740 months would exceed what a life sentence would be.

18        I just wanted to explain that to -- you know,

19   anybody who is here who is not used to these things on how it

20   is that we work them out.  I mean, the guidelines, as you will

21   hear me say in a few minutes, are advisory, but they are a

22   starting point.  And that's what the appellate court tells me,

23   it's a starting point in terms of imposing a sentence that's

24   fair and appropriate and accomplishes the goals of the

25   sentencing guidelines.

1          So with that, I'll turn it over to you.  Go ahead,
2    Ms. King.

3          MS. KING:  Thank you, your Honor.

4          Your Honor, this defendant is the worst of the
5    worst.  He is the big fish in the child exploitation world.
6    He is a serial child rapist, and he is the defendant that
7    you make an example of for deterrence purposes.

8          His guidelines, as the Court just discussed, are
9    life in prison, or approximately 145 years.  Life in prison
10   is the only sentence appropriate to ensure the safety of the
11   community, to ensure the safety of the innocent children in
12   this world, and to send a message.

13         This defendant fueled the child exploitation
14   community online for over one decade, for 11 years.  He is
15   credited with creating at least six known NCMEC series, some
16   of which this Court has likely seen in other child exploitation
17   cases.

18         These aren't images and videos out in an abyss.
19   Law enforcement is catching, the United States Attorney's
20   Office is prosecuting, and the Court is sentencing real
21   individuals that have received the media of the child sexual
22   abuse this defendant inflicted, recorded and distributed.

23         THE COURT:  Without saying anything that you can't
24   say because of the investigations or tactics or techniques
25   that are not appropriate to disclose in a courtroom, how was it

that eventually he was caught? I know what the presentence report says. How was it -- was it based on information developed? That's my first question.

And then secondly, why -- how are these individuals able to not be detected by law enforcement despite their best efforts?

MS. KING: Your Honor, the work that is done on the dark web by these individuals is calculated. This defendant, in particular, actually spent time on dark web forums instructing individuals and providing advice on how to avoid detection in the filming of providing child pornography, as well as avoiding detection from law enforcement.

While the dark web technology has increased and grown, so has investigative efforts. And as such, law enforcement was able to discover his presence on the dark web.

THE COURT: I applaud them for their great work and in bringing this case to justice. I just put myself in the shoes of the victim, and I'm sure they all wish that he had been -- that something had happened beforehand, and that's why I brought that up so that while we are very grateful to the work of the law enforcement officers, how are these individuals able to hide themselves?

And certainly as a background in engineering, he

1    would know more about computers and techniques than somebody

2    like I would.  So I imagine that those are things that he,

3    as you said, not only used to his benefit, but he shared his

4    ideas with other predators.

5                MS. KING:  Yes, your Honor.

6                Your Honor, this defendant's abuse knew no bounds.

7    He collected female children's underwear all across the state

8    in various places he was living.  He took videos of children

9    using the bathroom at public places like a gymnastics studio

10   or a splash pad.

11               THE COURT:  Right.  Well, and you see these

12   predators work as -- I have had them as teachers, as religious

13   personnel, as bus drivers, as Cub Scout leaders.  Those are the

14   ones that come to mind.  And so they're in places where, you

15   know, children congregate.

16               And, you know, reading these victim statements

17   is just heartbreaking, but as you say, or as one of the victims

18   said, you know, they try to outsmart people.

19               You wouldn't expect a coworker, for instance, who

20   is visiting you for dinner in your own home or when you go

21   to the coworker's house to do this to your child.  Who would

22   expect that?  Certainly not I.

23               MS. KING:  He broke the sanctity of trust of

24   children using the bathroom at his house.  Friends of his

25   children, neighbors going to the bathroom were no longer

1    safe due to this defendant.

2         He created child pornography using artificial

3    intelligence.  As the Court talks about the various technology

4    and growing technology and this defendant's intelligence

5    relating to technology, he -- producing, distributing,

6    hands-on, this is no longer enough and he then moved to

7    artificial intelligence.

8         He took innocent photos of children that he had

9    in his possession that he took in private places, such as his

10   home, as well as public places such as Disney World, and

11   created child pornography using these individuals' faces,

12   unsuspecting individuals in public places.

13        He produced child pornography, as the Court is

14   well-aware.  Law enforcement has been able to confirm his

15   sexual abuse of nearly 30 victims, 30 children, not all of

16   whom have been identified by name.

17        THE COURT:  And these are actual people that he,

18   one way or the other, was involved with?

19        MS. KING:  Yes.

20        THE COURT:  So these aren't -- and I think what

21   distinguishes this case from so many of the other cases that

22   we see is this was creation of the child pornography as

23   opposed to sending or receiving.

24        I have seen cases like this in the United States.

25   Most of the cases that I see are where somebody travels to

1    a place, I'll just say like, the Philippines, which is a very

2    poor country, and the mothers -- in essence, this is what

3    they're doing, selling -- selling their children to these

4    predators who come from the United States for that purpose.

5          Here, in my opinion, what makes this excruciatingly

6    evil is that he is preying on the children of friends and

7    neighbors -- apparently, most of them were or many of them

8    were -- his own child, and I would say probably the one that

9    is the most heartbreaking is the stepdaughter, the daughter

10   of his then-wife who trusted him -- trusted him to be a good

11   father, and this is what happens.  Of all of them, that's

12   probably the one that I found the most heartbreaking, quite

13   frankly.  I'm sure everybody here in the courtroom was moved

14   to the same extent that I was.

15         MS. KING:  As your Honor notes, there was no one

16   that was safe from this defendant.  He raped children as

17   young as infants, less than one year old.  I think his

18   youngest victim was three to four months old.  He details

19   his abuse online, providing explicit details of taking diapers

20   off his victims.

21         THE COURT:  I -- I read that.  It was really

22   disturbing.

23         MS. KING:  His crimes carry mandatory life sentences

24   at the state level.  A life sentence here is his guideline, and

25   that is appropriate.

1    He raped children in his care, custody and control.

2 He raped children he had access to for only an hour or a night.

3 He utilized medicine to make at least one child sleep better

4 to be able to abuse her, and online he explored topics of

5 using alcohol or hallucinogens.

6    THE COURT:  Well, and the victims are not only

7 these precious children, but their parents who feel that

8 they've let their children down.  Of course, they did their

9 best jobs as parents.  These -- these people are very conniving

10 and, you know, they just shouldn't blame themselves.  They

11 did the best they could.  It's hard to detect these people.

12 It really is.  It's very hard, but they're real victims as

13 well.

14    MS. KING:  Yes.  And the government concurs with

15 that sentiment wholeheartedly.

16    The government does feel that this defendant, not

17 only has traumatized each child, but has traumatized every

18 family member, every friend, every future relationship based on

19 his abuse.

20    THE COURT:  Well, and you had those people come in

21 and make a statement to the Court.  So I understand it.

22    MS. KING:  Anyone that has come into contact with

23 this defendant has a cause for concern.  He invaded every

24 inherent safe space similar to the way of a parasite.

25    He was nearly caught several times and that still

1    did not deter him.  The Department of Children and Family

2    investigated him twice and he did not stop.  He bragged online

3    about almost being caught several times by adults in his

4    presence, and he did not stop.

5            In fact, he actually then went online to talk

6    about these instances and provide advice to other individuals

7    on dark websites dedicated solely to child pornography on

8    what film and camera equipment to use and the best ways to

9    avoid detection.

10           This defendant has made this world is a

11   significantly more dangerous place.

12           THE COURT:  Well, that's why the work of these

13   agents, who were the case agents, is particularly -- well,

14   something you heard one of the victims say, how grateful she

15   was to the work of the case agents.

16           And it's so important when there were other times in

17   the past where he was not able to be caught, close, but it

18   didn't happen.  So their work is particularly important in

19   light of that.

20           MS. KING:  Your Honor, life in prison is the

21   only appropriate sentence for this defendant based on the

22   Section 3553 sentencing factors and the guidelines.  His

23   conduct was true evil.  He has not been previously deterred

24   by authority or adult intervention.

25           His sexual deviance drove his actions and could

1  not be contained or stopped.  He committed these acts

2  constantly over the course of 11 years.  He preyed on anyone

3  within his reach.  He must be put away for life to be held

4  accountable for his actions and to show the child pornography

5  community that if you sexually abuse children and contribute

6  to this type of media, you will be harshly punished.

7              THE COURT:  Well, as I've said, I've imposed life

8  sentences in this kind of case before where it's production

9  of child pornography.

10             As you said, what it is is it's raping children.

11 That's exactly what it is.  And this is probably, if not the

12 most extreme, one of the most extremes that I've seen.

13             MS. KING:  Thank you, your Honor.

14             THE COURT:  But I will wait until I hear from

15 Mr. Rosenthal.

16             So you are asking for a life sentence, and if he

17 were ever released, a lifetime of supervised release?

18             MS. KING:  Yes, your Honor.

19             THE COURT:  All right.  Thank you very much.

20             Mr. Rosenthal, first of all, I appreciate your

21 job here today as an assistant federal defender representing

22 Mr. Culmo.  We're grateful for your work here today.  I'll

23 begin by saying that.

24             Do you know of any reason why this Court -- after

25 I hear from you -- should not proceed with imposition of

                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

1    sentence, Mr. Rosenthal?

2              MR. ROSENTHAL:  No, your Honor.

3              THE COURT:  This is your opportunity to make

4    a statement, present any information in mitigation of this

5    sentence.

6              Mr. Culmo, you have the right to address the

7    Court directly.  You don't have to.  I've already read your

8    statement to the Court.  But at this juncture, I just want

9    to verify that you understand that you have that right.

10             Do you understand that, Mr. Culmo?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Thank you, Mr. Culmo.

13             Mr. Rosenthal, I'll hear from you now.

14             MR. ROSENTHAL:  Your Honor, first of all, we

15   have not made any objections to the facts contained in the

16   presentence report.  They are -- we're not -- there are no

17   excuses, nor are we going to make any.

18             The -- we are -- I'm being somewhat modest in what

19   I'm going to be requesting.

20             THE COURT:  No.  And I understand.

21             And what makes it difficult is, I understand that

22   when you plead guilty -- when your client pleads guilty, he's

23   giving up a lot, and that's the right to a jury trial.  And you

24   never really know what a jury is going to do.

25             We've all seen verdicts that, for the most part,

1    they get it right.  But every now and then, you will have
2    one you don't 100 percent agree with.
3         So anything can happen, and you've given that
4    up with the hope that a judge will give a lower sentence.
5    I understand that.  And your very well-done reports here, or
6    your memo, and the very thoughtful reports prepared by the
7    medical experts.
8         MR. ROSENTHAL:  Thank you, your Honor.
9         What -- I mean, I will speak to the 3553 factors.
10   But again, I just -- to reiterate, we're not making any
11   excuses.  Mr. Culmo is not making any excuses.  I'm not making
12   any excuses on his behalf.
13        A couple of things.  He plead guilty knowing that
14   the guidelines were going to be extremely severe.  He -- he
15   has cooperated, which I will discuss in a moment.  There is
16   no effective credit for his acceptance of responsibility.  We
17   are exactly where we would be had Mr. Culmo exercised his
18   right to a trial.
19        The acceptance of responsibility that is calculated
20   in the guidelines has really no effective -- has really no
21   effective credit for that -- for that acceptance.
22        If -- you know, somebody who is to receive a life
23   sentencing, it really doesn't matter whether it's a Level 51
24   or a Level 43.  He would be in the exact same position he
25   would be had he put everyone through the ordeal of a trial.

1   And we understand and appreciate what has been stated by the

2   individuals that have been affected by this.

3            I would suggest to the Court that that would be

4   that much more severe had we -- had Mr. Culmo made the

5   determination to take this matter to a trial with all the

6   anxiety and all the stress and the retrauma- -- the

7   retraumatization that something like that would involve.

8            The government has -- has talked at great length

9   about everything that Mr. Culmo did wrong.  And obviously,

10  there is plenty before he was charged.

11           Since he has been charged, I would argue to the

12  Court that he's basically done everything right.  He confessed

13  upfront when he was first approached that -- that he has

14  expressed remorse in the letter that the Court has received.

15  As short as it may be, it expresses his opinions.  I -- we

16  would suggest to the Court that there should be some

17  recognition for that.

18           What I would also add, your Honor, and really his

19  former wife made reference to the fact that the divorce

20  proceedings have concluded.

21           Mr. Culmo has additionally agreed to -- I mean, we

22  understand the Court would have proposed it anyway, but in

23  terms of the requested restitution, he has entered a

24  stipulation agreeing that the requested restitution shall be

25  paid from the proceeds of the -- the divorce settlement, which

1 is, as I understand it -- and I tried to confirm it this

2 morning, but I wasn't able to reach him.  My understanding is

3 that those funds are in the -- in his lawyer's trust account.

4          THE COURT:  Okay.

5          MR. ROSENTHAL:  So there's no -- and, you know,

6 there's no issue as to whether or not the restitution would

7 be paid.  And we suggest to the Court that there should be some

8 recognition as to that.

9          As to the cooperation issue, I'm a little bit there

10 a surprised by the government's sentencing memorandum.  And

11 obviously I was not involved in that -- at that time -- at the

12 time of Mr. Culmo's proffer, that was two lawyers back, but

13 Ms. Sylvia Irvin was representing him at the time, and I have

14 spoken to her.  I also have her notes as to the proffer.  And

15 I would note upfront that this was basically -- it was a

16 two-day proffer that covered the most -- the better part of

17 two days.

18          Ms. Irvin had indicated she never recalled doing a

19 proffer on a case like this, other than this one, and I -- I

20 can say I don't recall ever doing that -- doing one as well.

21 Her notes are -- were quite detailed.  And I certainly don't

22 remember a proffer in any matter that actually went on for the

23 better part of two days.

24          THE COURT:  That is pretty significant.  There's

25 no doubt about that.

1           MR. ROSENTHAL:  And the ground rules -- and it could

2    just -- so the ground rules were -- and this is reflected in

3    Ms. Irvin's notes -- in her notes in the reports of the -- that

4    I received from the agent basically mirror each other.

5           I mean, I understand the government takes the

6    position that they don't believe that he was completely

7    candid, which raises some questions as to why they talked

8    to him for two days if they don't think that, you know,

9    he's -- that he's being completely candid.

10          The -- the ground rules were that the -- any

11   minors that he identified would not be considered for purposes

12   of a potential 5K.  I'm not suggesting the government has any

13   obligation to file a 5K.  That hasn't been the position taken.

14   But that any identification of any individual minors would be

15   considered as part of acceptance of responsibility.

16          As I noted, there is no effective credit for

17   acceptance of responsibility.

18          The additional -- Mr. Culmo wasn't advised that

19   should he provide additional information concerning the dark

20   web and other people that were involved perhaps that was

21   something that the government might -- might consider.

22          And I'm -- I'm not in a position -- obviously

23   because we don't know the question -- so we have to take at

24   face value the government's position that this cooperation

25   was not of value to them.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1          But as we noted in the sentencing memorandum,

2    whether it is of value to them, nonetheless, the Court can and

3    in our view should consider that in terms of the sentencing the

4    Court imposes bearing on the issue of the rehabilitative

5    intent.

6          And again, as -- as I indicated, whatever Mr. Culmo

7    had done wrong -- and obviously there is plenty -- he has done

8    things right since the time that he was charged.

9          They actually had an agent that had come down from

10   Maine to be present for the proffer.  There was -- the original

11   Assistant United States Attorney was present, I believe, for

12   the first day of the proffer.  And Ms. Irvin was present, as

13   I indicated, for both days.

14         He was actually transported to the HSI interview --

15   for the interview -- for the debriefing.

16         The first part of day one of the interview dealt

17   with really sort of the technical issues; his devices, how

18   they were backed up, how they were encrypted.  He also provided

19   passwords, which would have, in theory at least, allowed the

20   government to assume an online identity.  I have no knowledge

21   if they actually did that.  He talked about how the devices

22   were backed up and why he backed them up.

23         And after that part of the discussion -- and the

24   first part of that day one really involved -- began and end was

25   -- it ended with some technical issues.  In the meantime, there

1  was some discussion about individual minors, how things came

2  about, identifying locations, identifying how things -- you

3  know, how things occurred.

4           In one instance, there was a question and he could

5  not recall an associated adult's name.  And he asked if they

6  could show him his Facebook page because that might refresh

7  his memory in that regard.

8           So the notes that I -- that I saw and in the

9  summary that I saw from Ms. Irvin indicated that this was not

10  somebody that -- you know, we have all sat in on proffers where

11  somebody has to be confronted with the evidence against

12  them and then at that point they decide to fess up.  This

13  was not that circumstance.

14           It is that he did not have to be prompted and

15  that basically gave -- he gave the information as far as -- as

16  far as what had -- what had occurred.

17           The -- at the end of the day, the first day, there

18  was a discussion and it was -- I've got to admit was way over

19  my head -- but it dealt with the use of artificial

20  intelligence, stable diffusion.  The agents had a lot of

21  questions as to how he went about doing that, which, you know,

22  you would think at least, you know, that discussion would have

23  had some value -- a value to them.

24           Day two was basic- -- it seems to me was basically

25  devoted to identification with respect to minors that were

1    involved.  It was slow and methodical.  And as I read the

2    report, it really got into about the identification of --

3    of -- over 30 minors.

4              So what we're suggesting is -- and again, your

5    Honor, I'm trying to be realistic here, but --

6              THE COURT:  Sure.

7              MR. ROSENTHAL:  -- there should be some -- or

8    we would ask the Court to consider that there should be some

9    credit for both acceptance of responsibility and cooperation,

10   even if that cooperation doesn't reach the level of a 5K1.1.

11   And obviously that -- that -- although the government makes

12   an argument that this sentence should send a message, but

13   it should also send a message, we would submit to the Court,

14   as to the benefits of acceptance of responsibility and the

15   benefits of cooperation.

16             The -- in terms of the 3553 factors that we believe

17   are relevant, I mean, Mr. Culmo grew up with a single parent

18   household.  Both of his parents are here today, by the way.

19   They're in the courtroom.  That -- there was some indication,

20   this was in Dr. Imhof's report, that he was exposed to abusive

21   behavior at a young age, exposed to adult pornography at a

22   young age.

23             As a child, there were some issues, you know, and

24   that his mother had him taken to a psychologist -- psychiatrist

25   actually, diagnosed with ADHD, which, of course, this was the

1  1980s, everybody was diagnosed with ADHD.  Not much was known

2  at that point, or at least not much was front and center with

3  respect to ASD, and that -- but although there were what appear

4  to be, from reading his mother's accounts, it would appear

5  there might have been some warning signs that -- that there

6  might have been a diagnosis that went beyond ADHD.

7           Mr. Culmo -- his mother reports that he was bullied

8  in school because apparently he had a weight problem at that

9  point.  He was -- but he was active in some normal thing like

10 taekwondo and -- and band.

11          As an adult, he did have some successes.  He was

12 gainfully employed.

13          THE COURT:  Well, he graduated with a mechanical --

14 I think it was a mechanical engineering degree --

15          MR. ROSENTHAL:  Right, your Honor,

16          THE COURT:  -- I think it was UCF?  That's no small

17 accomplishment, honestly.

18          MR. ROSENTHAL:  It is, your Honor.

19          And he was involved -- as was mentioned, he was

20 involved in the community.  That he was a homeowner.  That he

21 has -- as an adult now, of course, everything is mixed, I mean,

22 as an adult, and this was in Paragraph 115, that he was

23 diagnosed with a major depressive disorder.

24          Dr. McClain had indicated this is -- this was

25 the first time that this had been diagnosed, but she does

1   conclude that -- that he is on the spectrum.  And, you know,
2   there may be things that we can look back at that were reported
3   in his earlier life that might cause one to come to -- to at
4   least be on notice of that.
5          Dr. Imhof agreed, not based upon his own tests, but
6   basically based upon Dr. McClain's history -- he agreed with
7   that in terms of his diagnosis.  He did perform some tests
8   on -- on Mr. Culmo.  It -- it sounds like the one that the
9   government had the issue with was the STABLE-2007 test, but
10  that wasn't the only test and that indicated -- and this is
11  all, you know, statistical calculations.  I mean, somebody is
12  always -- they're either 100 percent risk to reoffend or
13  zero percent risk to reoffend.
14         Statistically, based upon the objective testing,
15  Mr. Culmo falls in what would be considered to be the average
16  category, which would be, you know, still statistically low.
17         But to the extent that the government takes issue
18  with that, and I know that they did in their sentencing
19  memorandum, you know, of course, we're not talking about next
20  year.  We're not talking about five years from now.  We're not
21  talking about ten years from now.  Even if the Court were to
22  impose the average sentence for somebody that finds themselves
23  in a Level 43, History Category of I, Mr. Culmo would not be
24  released until well past middle age.
25         So in terms of concerns that he -- that he would

1  pose a risk at that point -- and as we know, that in

2  particularly these kind of offenses, the risk to reoffend goes

3  significantly down as somebody ages.

4         And again, this is, you know, Mr. Culmo -- if he

5  received an average sentence, would still be in -- would still

6  be in prison well into his late 60s, if not into his

7  70s.

8         So, you know, one of the things the Court raised

9  in terms of why the -- the guidelines are expressed the way

10 they are is -- basically it's because of the number of counts.

11 I've certainly represented people charged with more horrendous

12 specific conduct, but because there were not so many counts,

13 that's what -- that's what kept the guidelines down.

14         I think, if I remember correctly, that was the issue

15 and irony, is that if somebody had engaged in horrendous

16 conduct, but because there was only -- there was a finite

17 number of counts, there was only so much that that individual

18 could be sentenced.

19         So in summary, your Honor, the mental health issues

20 are -- the Court -- the Court can make use of those as the

21 Court analyzes those.  We do believe that they're relevant in

22 this circumstance.

23         But in sum, we believe that there should be

24 meaningful credit for acceptance of responsibility and for the

25 efforts to cooperate with the government, and we'd ask the

1   Court to impose a sentence that accounts for that as well.

2          THE COURT:  All right, Mr. Rosenthal.  Thank you

3   very much.

4          And as I said, I appreciate your work on this and

5   the work of the federal defender's office.

6          Mr. Culmo, do you wish to say anything?

7          MR. ROSENTHAL:  Your Honor, I think Mr. Culmo does

8   want to add to what he had said previously.

9          THE COURT:  All right.

10          MR. ROSENTHAL:  Do you want -- does the Court prefer

11   he went to the podium or --

12          THE COURT:  He can stay seated.  That's fine.

13          THE DEFENDANT:  Thank you.

14          I just wanted to apologize to pretty much everyone

15   in this room, outside of this room, people that I interacted

16   with, the people that I helped identify.

17          I learned back in 2023 -- I was on an antidepressant

18   and I, umm, I discovered something about being on an

19   antidepressant and that is the brain fools itself.  I thought

20   that things were getting better.  Things were getting worse.

21   Umm, I thought things were getting worse when they got better,

22   when I came off of the medication.

23          And, umm, as such, you know, I -- I have my friends,

24   my family all around me.  And I have tricked myself.  My brain

25   had tricked itself into thinking that I was a better person.  I

1    tricked myself into thinking I was a better father.  I tricked

2    myself into thinking that I was a better friend, a better son,

3    a better coworker, a better everything.

4              I've earned a lot of things throughout my life.

5    I've worked nonstop.  I delighted in having people, friends

6    and family, around me and helping people, even strangers,

7    helping people on the side of the road, helping people

8    within my circle.

9              But I had tricked myself into thinking that I had

10   done right when I had done wrong.  I tricked myself into

11   believing that I -- umm, that I was good.

12             There were times that I had DCF at my house.

13   There were times that I considered -- I considered a lot of

14   things.  I entered a lot of depression.  I -- umm, not a lot

15   of people know this.  I actually had several times planned

16   to end my life.  I used to carry a bottle of -- I don't know

17   if anyone knows this, I used to carry a bottle of prescription

18   medications that I figured would end it all.

19             Somehow, I got over the hump and I returned to

20   whatever it was I returned to at times, and then the process

21   started over and I tricked myself again.

22             So I'm sorry to my friends and my family.  I have

23   love for everybody, everyone that I've interacted with,

24   everyone I know, all the people that sit behind me.  I miss

25   them.  I love them.  I don't know how I can do without them.

1            So those are all the thoughts that I have.

2            THE COURT:  Well, you know, you have wonderful

3    parents that are standing behind you here.  You know, not

4    everybody has that.  So you have your parents who, despite

5    hearing these things, they're here supporting you.

6            THE DEFENDANT:  I would like to add one more thing.

7            You know, when I -- on September 26th, when

8    everything kind of crashed down on me, that -- the weight

9    of everything finally hit.  And there's a reason why I

10   cooperated.  There's a reason why, even in my own house,

11   my neighbor, she even came by helping me to obtain a lawyer,

12   and she told me stop talking, you know, you have a right to

13   remain silent.  I never stayed silent and I just kept going

14   and going saying everything.

15           There is a lot of guilt in that.  There is a lot

16   of pain that all of us had.  And my pain isn't anything close

17   to what other people are feeling, but I've -- you know,

18   there's -- there's a lot in my life that I only just started

19   to think about.  There's a lot that I only just started to

20   think about, you know, later on.

21           Some of these events happened way before I found

22   my wife, before I found my children.  There are people that

23   I knew that they believe that, you know, I befriended them for

24   one reason alone, and that's not true.  Some of these people

25   were -- I was friends with them before they had children.

1          You know, I -- I don't expect that many people

2   will come to my defense.  Many people will have a lot to say

3   to me in light of the person I was, in light of the good that

4   I had, because I had both, and one of them is much more

5   inexcusable than the other.

6          So thank you, your Honor.

7          THE COURT:  All right.

8          THE DEFENDANT:  Thank you, everybody.

9          THE COURT:  Thank you, Mr. Culmo.

10          Let me just ask one thing about the sentence.

11   You know, I'll begin by saying, Ms. King, he will spend the

12   rest of his life behind bars.  That is the sentence I'm going

13   to impose.

14          Probation has told me, though, that I cannot impose

15   a life sentence.  So I know you asked that in your memo, but

16   do you recognize now that I can't do that?

17          MS. KING:  Yes, your Honor.  In looking at the PSR,

18   and United States Sentencing Guidelines Section 5G1.2(b), it

19   does appear that the Court would need to do consecutive

20   sentences of the statutory max in order to get to that

21   1,740 months.

22          THE COURT:  Right.  But the point is, I can't say --

23          MS. KING:  Correct.

24          THE COURT:  -- a life sentence as -- when I read

25   your memo, I was somewhat prepared -- not somewhat, I mean,

1  if -- if I had been satisfied at the end of this hearing, I

2  would have imposed a sentence of life, which I think is the

3  maximum sentence that I, as a judge, can impose.

4          The problem here is either the way it was indicted,

5  charged, I, quite frankly, don't know exactly why, but

6  probation is telling me that the maximum sentence that I can

7  impose is what I said earlier, 1,740 months.  I can't impose

8  a sentence more than that.

9          I can impose, for instance, a sentence of, we'll

10  just say, 75 years.  This man is 40 years old, if I'm not

11  mistaken, or something in that neighborhood.

12          Mr. Rosenthal, how old is your client?

13          MR. ROSENTHAL:  He's 40.

14          THE COURT:  40.  That's what I thought, 40 years

15  old.  A sentence of 75 years or 90 (sic) months is more than a

16  life sentence for somebody 40 years old.

17          It's just that, you know, I understand the victims

18  are asking for a life sentence.  I want to explain I can't.

19  Probation is telling me that that would be, in essence, an

20  illegal sentence.  That's one that on appeal, the Eleventh

21  Circuit would reverse and say that I don't have the authority

22  to impose.

23          Ms. Campbell, just tell me why I can't impose that,

24  and also so the victims understand why it can't be done.

25          PROBATION OFFICER CAMPBELL:  Your Honor, the counts

1   won't permit a life sentence.  They have statutory maximums.

2   As to Counts 1, 3 and 4, the maximum sentence that can be

3   imposed on those counts is 30 years.

4           As to Counts 2 and 5, the maximum sentence that can

5   be imposed on those counts is 20 years.

6           And as to Count 6, the maximum sentence that can be

7   imposed is 15 years, your Honor.

8           THE COURT:  So we're talking 900 months, 75 years,

9   that's what I can impose?

10          PROBATION OFFICER CAMPBELL:  Well, you can go up

11  to 1,740 months, your Honor, which I think is 145 years.  Let's

12  see.

13          MS. KING:  The government calculated that as

14  145 years.

15          THE COURT:  145 years.

16          A term of 900 months, or 75 years, would that be --

17  tell me about that one as opposed to 1,740 months.

18          That would involve a concurrent sentence as well as

19  a consecutive sentence, correct?

20          PROBATION OFFICER CAMPBELL:  Correct, your Honor.

21          THE COURT:  So given those -- thank you so much.

22  I appreciate that.

23          Given those parameters that I can't -- it would be

24  illegal if I imposed the sentence you had asked for, we would

25  be back here in whatever time it would take the appellate court

1  to reverse me.

2       Tell me what sentence you are recommending that this

3  Court impose.  I think Mr. Rosenthal also has a right to hear

4  that, given the parameters here.

5       MS. KING:  And, your Honor, I do apologize.  When I

6  was reviewing the sentencing guidelines chart, it obviously

7  says life, and I do now understand from probation the maximum

8  cap there because of these charges do not carry a lifetime

9  maximum sentence.

10      THE COURT:  Right.  So the way that you would get

11 to the 900 months, as opposed to the 1,740 months, is that

12 you have the concurrent sentence, as I understand it, as to

13 Counts 1, 3 and 4, and then a consecutive sentence for Count 2,

14 a consecutive sentence as to Count 5, a consecutive sentence

15 as to Count 6.  That's how you would get the 900 months, which

16 is 75 years.

17      If you wanted to -- if you felt that Mr. Culmo was

18 entitled to, I don't know, if you want to call it this, a

19 benefit for having plead guilty, otherwise it's -- I think it's

20 1,740 months is the maximum.

21      Tell me -- let me ask Ms. Campbell, how was that

22 calculated?

23      PROBATION OFFICER CAMPBELL:  The 1,740 months is

24 calculated by adding the maximum -- the statutory maximum

25 term of imprisonment for each count.

1           So we have the 1, 3 and 4, the 30 years, 30, 30, 30,

2    and then so on and so forth.  Your Honor, you know, the

3    20 years on Counts 2 and Count 5, and the 15 years stat maximum

4    Count 6.

5           THE COURT:  All right.  So that's how she calculated

6    that, Ms. King.

7           And Mr. Rosenthal, I'll come back to you.

8           So Ms. King, what is your position as to an

9    appropriate sentence for Mr. Culmo based on that analysis?

10          MS. KING:  Your Honor, it is the government's

11   position that the 1,740 month sentence is the appropriate

12   sentence and the appropriate term of months.

13          Each count represents a different victim.  This

14   is not a situation in which we have the same victim over a

15   course of time.  These are separate and distinct victims,

16   and each victim deserves the justice of knowing that their

17   count got the maximum possible sentence separate and distinct

18   and consecutive from any other victim in this case.

19          THE COURT:  I see.  All right.

20          And with respect to, for instance, if I were to do

21   the 900 months, or 75 years, it's your position that each

22   victim would not be getting his or her due, is that basically

23   it?

24          MS. KING:  Yes, your Honor.

25          THE COURT:  Okay.  Probation, do you have a position

1    on that?  I want to make certain that I hear every voice before
2    I go to Mr. Rosenthal.
3            PROBATION OFFICER CAMPBELL:  No, your Honor, nothing
4    outside of what the recommendation was.
5            THE COURT:  All right.  Thank you very much.
6            All right.  So you're are asking the max.
7            Ms. King, how do you respond to Mr. Rosenthal?
8            Number one, this defendant plead guilty.  We'll
9    just start with that.  He plead guilty.
10           Number two, he was debriefed for two days.
11   Maybe there are differences of opinion as to what he said
12   or didn't say, but, regardless, he was debriefed for two
13   days.  And certainly law enforcement does learn something
14   from that debriefing, even if he wasn't 100 percent forthcoming
15   or 100 percent honest.  Still, you do gain something when
16   you have that.
17           And there has to be a benefit to people who plead
18   guilty.  You know, when 97 or 98 percent of all defendants in
19   the Middle District of Florida plead guilty, there has to be
20   a benefit.  Otherwise, why would they plead guilty to just see
21   what happens in front of a jury.
22           While I do think that there's a lot to be gained
23   from the victims coming in and speaking to the Court, to
24   subject yourself to a cross-examination is -- can certainly be
25   challenging for some victims.  And I've heard victims say it's

1  as if they were assaulted a second time when they have to
2  subject themselves to a cross-examination.

3        So all of those things, I'm just trying to be fair
4  to everybody here, recognizing that he is going to go to prison
5  for the rest of his life.  Let there be no doubt about that.
6  Whether it's 900 months, which is 75 years, he's a 40-year-old
7  man, even with whatever minimal gain time the federal prison
8  system provides, we're still talking about the rest of his
9  life, regardless.

10       This man, I'll just say it right now, deserves to go
11 to prison for the rest of his life.  That's all there is to it.
12 It's just whether it's going to be acknowledging his having
13 come in, pled guilty, being debriefed, which would result in a
14 75-year sentence, and it would be the way that I just
15 explained, or 1,740 months in prison, the absolute maximum that
16 he could get.

17       What's your response to what Mr. Rosenthal said?
18       MS. KING:  Your Honor, the government detailed
19 briefly in its sentencing memorandum the concerns with the
20 veracity and cooperation.  As part of the proffer, there were
21 half truths.  There were misinformation.  There was lack of
22 information.  There were statements throughout his, quote
23 confession, as well as the proffer trying to gauge what law
24 enforcement actually had before providing any further detail.
25       In cases where defendants do cooperate fully and

1  truthfully, they are given that benefit of a 5K.  That's not

2  the situation here.

3        THE COURT:  Well, it's not -- well, no, that's

4  acceptance of responsibility, being debriefed.  That's

5  acceptance of responsibility.  A 5K is do you provide

6  information about other people or are you the first to plead

7  guilty.

8        It's a hard argument to make as to why he shouldn't

9  get something.  I have still, in other cases, sentenced at the

10  top of the guidelines.  I've done that on pleas, the cases

11  that merit it, I absolutely have, where I want to make certain

12  that somebody is away and can't reoffend, we'll just start with

13  that, where society is safe and punish the defendant.  That's

14  really what I look at, punishing the defendant and making

15  certain that society is safe so that he doesn't do

16  this again to anybody else.  That's what I look at.  Those

17  are the two main criteria.

18        A sentence of 75 years still does that.  You know,

19  a sentence of 145 years?  I'm not certain that a sentence of

20  145 years is the best sentence here, I'll just say that, when

21  he's still going to go to prison for the rest of his life,

22  given what our system is supposed to encourage.

23        I want to make certain -- that's why I asked

24  probation.  I want to make certain that I understand your

25  argument.  You're saying to me that there are victims that

Case 8:23-cr-00385-VMC-CPT    Document 102    Filed 06/23/25    Page 71 of 89 PageID
461
71

1  would not be, I'll just say, their crimes accounted for if I

2  impose a sentence of 75 years.  And I wasn't certain -- I mean,

3  let me go back to probation because, quite frankly, I was so

4  focused on your life sentence in the memo, that that's what

5  I was focused on.  And I now -- you know, thank you probation

6  officer for informing me that that would not have been a legal

7  sentence.

8          So I was really focused on that and quite prepared

9  to do it, but now I just need to refocus and make certain that

10 I still impose a sentence that's fair and appropriate under

11 the guidelines and that is not excessive, because that's what

12 is also expected of me.  So that's what -- that's why I asked

13 you that question, Ms. King.

14         MS. KING:  I understand, your Honor.

15         The government still maintains that --

16         THE COURT:  Okay.

17         MS. KING:  -- a sentence in the three digits,

18 whether the Court decides to give some credit for respons- --

19 acceptance of responsibility and goes down to 100 years,

20 there has to be some showing that -- you know, his guidelines

21 are off the chart, right?

22         THE COURT:  Of course.

23         MS. KING:  He -- he -- his conduct is so

24 reprehensible, so evil, that the sentence does need to reflect

25 that.  And I understand the Court is trying to accommodate

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1  that.  It's just, the government is also trying to balance in

2  its request, making sure that the victims can move forward and

3  feel whole and feel heard.

4         THE COURT:  I totally agree with you.  No problem

5  on my end.  I think all of that is appropriate.  I just want

6  to make certain that it doesn't rise to the level of being

7  an excessive sentence.  I do wish that life had been an option

8  here.  It's just simply not.

9         So let's just -- let me go back to probation.  I

10  think the difference is some of these sentences are concurrent

11  that probation has discussed in its report.  So its not

12  uncommon to give a concurrent sentence.  That must be what

13  you're referring to, Ms. King, with respect to each victim --

14         MS. KING:  Yes.

15         THE COURT:  -- not receiving their dues, so to

16  speak.  That's not an uncommon occurrence here in federal

17  court.

18         MS. KING:  I understand, your Honor.

19         THE COURT:  Is to have victims have concurrent

20  sentences.

21         All right.  I have to think about this a moment

22  after hearing from Mr. Rosenthal.  As I said, I have walked

23  in here with one thought and, as I said, that sentence I

24  couldn't impose.

25         All right.  Mr. Rosenthal?

1          MR. ROSENTHAL:  Your Honor, we understand the --
2    the Court's intention as to what it -- as to what it intends
3    to accomplish from the sentence.  Let me just be clear
4    from our perspective.
5          THE COURT:  Sure.
6          MR. ROSENTHAL:  It's that we're asking -- we had
7    mentioned that the acceptance of responsibility and
8    cooperation, it should be a meaningful reduction for that.
9    In our -- in our judgment, that -- that -- a sentence of
10   30 years, which I think would be consistent with the average
11   sentences or the median sentence for -- in Level 43, Category I
12   for somebody with no prior record, that that would be
13   sufficient under 3553.
14         THE COURT:  No, I understand, Mr. Rosenthal.  You
15   do not want a sentence of 75 years for your client.  You are
16   asking for a sentence that for a 40-year-old man, you know, he
17   still has some expectation of life outside of the prison
18   sentence.  And you provided the summaries to me of what other
19   courts have imposed, other sentences that have been rendered.
20         You know, I met you when I first became a judge
21   20 years ago, 20 years ago, more than that, when I was assigned
22   to the Ft. Myers division.  There are a lot of cases where I
23   don't impose as harshly as I did 20 years ago.  It's just this
24   crime -- this type of crime, it's really hard for me to get
25   past.  I'll just say that.

1          When something happens to children, it's just -- I

2  just -- I just can't get past it.  That's just the bottom line.

3  I just can't get past it, even having done this job for more

4  than 20 years now.

5          I understand all the factors you've raised to me,

6  Mr. Rosenthal, in your best effort to do as good a job as

7  you and your other colleagues did for your client.

8          These crimes against children just -- there's just

9  something about them.

10         Okay.  I know what I'm going to do and I'm ready

11  to impose sentence.

12         Anybody else wish to say anything?

13         MS. KING:  No, your Honor.

14         THE COURT:  Okay.  All right.  Anything else,

15  Mr. Rosenthal?

16         MR. ROSENTHAL:  No, your Honor.

17         THE COURT:  Thank you.

18         The Court has asked the defendant why judgment

19  should not now be pronounced, and after hearing the defendant's

20  response, the Court has found no cause to the contrary.

21         The parties have made statements in their behalf

22  or have waived the opportunity to do so, and the Court has

23  reviewed the presentence report.

24         Pursuant to Title 18 United States Code

25  Sections 3551 and 3553, it is the judgment of the Court that

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1    the defendant, Justin Ryan Culmo, is hereby committed to the

2    custody of the Bureau of Prisons to be imprisoned for a term

3    of 900 months, or 75 years.  This term consists of 360-month

4    term as to Counts 1, 3 and 4 to run concurrently, a 240-month

5    term as to Count 2 to return consecutive to Counts 1, 3 and

6    4, a 120-month term as to Count 5 to run consecutive to

7    Counts 1, 2, 3 and 4, and a 180-month term as to Count 6 to

8    run consecutive to Counts 1, 2, 3, 4 and 5.

9            Upon release from imprisonment, you shall serve a

10   life term of supervised release.  This term consists of a

11   life term as to Counts 1 through 6, all such terms to run

12   concurrently.

13           While on supervised release, you shall comply

14   with the mandatory and standard conditions adopted by the

15   Court in the Middle District of Florida, which can be found at

16   Section 5D1.3(a) and (c) of the United States Sentencing

17   Guidelines.

18           In addition, you shall comply with the following

19   special conditions:  You shall participate in a mental health

20   treatment program, outpatient and/or inpatient, and follow the

21   probation officer's instructions regarding the implementation

22   of this Court directive.

23           Further, you shall contribute to the cost of these

24   services not to exceed an amount determined reasonable by the

25   probation office's sliding scale for mental health treatment

1  services.

2          You shall participate in a mental health program

3  specializing in sexual offender treatment and submit to

4  polygraph testing for treatment and monitoring purposes.

5          You shall follow the probation officer's

6  instructions regarding the implementation of this Court

7  directive.

8          Further, you shall contribute to the cost of such

9  treatment and/or polygraphs not to exceed an amount determined

10  reasonable by the probation officer based on ability to pay

11  or availability of third-party payment and in conformance

12  with the probation office's sliding scale for treatment

13  services.

14          You shall register with the state Sexual Offender

15  Registration Agency in any state where you reside, visit are

16  employed, carry on a vocation or are a student, as directed

17  by the probation officer.

18          The probation officer shall provide state officials

19  with all information required under Florida Sexual Predator and

20  Sexual Offender Notification and Registration statutes and/or

21  the Sex Offender Registration and Notification Act.  That's

22  Title 1 of the Adam Walsh Child Protection and Safety Act of

23  2006, Public Law 109-248, and may direct the defendant to

24  report to these agencies personally for required additional

25  processing such as photographing, fingerprinting and DNA

1  collection.

2          You shall have no direct contact with minors under

3  the age of 18 without the written approval of the probation

4  officer, and shall refrain from entering into any area where

5  children frequently congregate, including schools, daycare

6  centers, theme parks, playgrounds, et cetera.

7          You are prohibited from possessing, subscribing

8  to or viewing any images, videos, magazines, literature or

9  other materials depicting children in the nude and/or in

10 sexually explicit positions.

11         Without prior written approval of the probation

12 officer, you are prohibited from either possessing or using

13 a computer, including a Smartphone, a handheld computer

14 device, a gaming console or an electronic device capable

15 of connecting to an online service or an internet service

16 provider.  This prohibition includes a computer at a public

17 library, an internet cafè, your place of employment, an

18 educational facility.

19         Also, you are prohibited from possessing an

20 electronic data storage medium device, including a flash drive,

21 a compact disc, a floppy disc or using any data encryption

22 technique or program.

23         If approved to possess or use a device, you must

24 permit routine inspection of the device, including the hard

25 drive and any other electronic data storage medium to conform

1  adherence to this condition.

2          The United States Probation Office must conduct an

3  inspection in a manner no more intrusive than necessary to

4  ensure compliance with this condition.

5          If this condition might affect a third-party,

6  including your employer, you must inform the third-party of

7  this restriction, including the computer inspection provision.

8          You shall have no contact, direct or indirect,

9  with the victims.  And that means your former wife and his

10 stepdaughter, who was his stepdaughter, and his child, is

11 that right, Ms. King?

12         MS. KING:  Yes, your Honor.

13         THE COURT:  The victims do not want contact with

14 him.

15         MS. KING:  Correct.

16         THE COURT:  The former wife, the stepdaughter or

17 the daughter, no contact, right?

18         MS. KING:  Yes.

19         THE COURT:  All right.  Mr. Culmo, no contact with

20 any of them.

21         You shall submit to a search of your person,

22 residence, place of business, any storage units under your

23 control, computer or vehicle conducted by the United States

24 probation officer at a reasonable time and in a reasonable

25 manner based upon reasonable suspicion of contraband or

1    evidence of a violation of condition of release.

2              You shall inform any other residents that the

3    premises may be subject to a search pursuant to this condition.

4    Failure to submit to a search may be grounds for revocation.

5              You shall be prohibited from incurring new credit

6    charges, opening additional lines of credit or obligating

7    yourself for any major purchases without approval of the

8    probation officer.

9              You shall provide the probation officer access to

10   any requested financial information.

11             Having been convicted of a qualifying felony, you

12   must cooperate in the collection of DNA as directed by the

13   probation officer.

14             The mandatory drug testing requirements of the

15   Violent Crime Control Act are suspended.  However, you must

16   submit to random drug testing not to exceed 104 tests per

17   year.

18             The determination of restitution is deferred

19   pursuant to Title 18 United States Code Section 3664(d)(5).

20   A date for the final determination of victim losses shall be

21   under a separate order and will not exceed 90 days.

22             Does the defendant wish to be present for the

23   hearing or does the defendant wish to waive the right to be

24   present for the hearing?

25             MR. ROSENTHAL:  May I have just a moment, your

1  Honor?

2          THE COURT:  Okay.

3      (Brief pause.)

4          MR. ROSENTHAL:  Your Honor, Mr. Culmo is prepared

5  to waive his right to be present at that hearing.

6          THE COURT:  All right.  So he waives his right to be

7  present at the hearing.  It will be scheduled with notice when

8  we receive the information that we need.

9          Based on the financial status of the defendant,

10  the Court waives imposition of a fine.

11          Are there any forfeitures?  I think there were,

12  Ms. King, were there not?

13          MS. KING:  There were, your Honor.  It does look

14  like the Court has signed a final order of forfeiture in

15  Document 85.

16          THE COURT:  All right.  Thank you.  So that's

17  incorporated today.

18          It's further ordered that the defendant shall

19  pay the United States special assessments totaling $600,

20  which shall be due immediately.

21          The Court finds the defendant is indigent and the

22  special assessment pursuant to 18 United States Code

23  Section 3041 is not imposed.

24          The Court finds that the defendant is indigent and

25  the assessment pursuant to 18 United States Code Section

1  2259(a) is not imposed.

2          After considering the advisory sentencing guidelines

3  and all of the factors identified in Title 18 United States

4  Code Sections 3553(a)(1) through (7), the Court finds that the

5  sentence imposed is sufficient, but not greater than necessary,

6  to comply with the statutory purposes of sentencing.

7          So I have sentenced -- I have imposed a sentence

8  that is, in essence, a life sentence here.  I have imposed a

9  sentence that is, in essence -- it's 75 years.  Had I been able

10 to impose a life sentence, I would have done that.  I would

11 have imposed a life sentence.  I could not do that because of

12 statutory maximums that are -- that are at play here.

13         I've tried to be fair to you because you did

14 plead guilty.  You did not require the victims to come in

15 and to testify during a trial.  But still, as you can see,

16 the anguish that you have caused them.  And I don't know if

17 they'll be able to recover, many of them.  I hope that they

18 do.  I hope that they're able to turn the page and move

19 forward with their life.  But I have -- in my role as a

20 judge here where I am supposed to impose a sentence that's

21 not greater than necessary, I have restrained myself to the

22 75 years, which is 900 months.

23         For a 40-year-old man, even if taking into

24 calculation the time that you've already been incarcerated, the

25 time that -- you know, with what limited gain time he will

1    get -- and I will ask the probation officer, it's still a

2    sentence with whatever reduction, it will be 60 years in total,

3    would you say, or not even that, right?

4              PROBATION OFFICER CAMPBELL:  I don't think that,

5    your Honor.  He's only been in custody since September 26th,

6    2023.

7              THE COURT:  All right.  So it's more than 70 years?

8              PROBATION OFFICER CAMPBELL:  Correct, your Honor.

9              THE COURT:  More than 70 years.  So for a

10   40-year-old man, that's a sentence that will exceed his

11   lifetime.  And these are given as either concurrent

12   sentences -- you know, I heard what the prosecutor said and

13   I hope the victims don't feel that way.  It's pretty typical

14   when it's a guilty plea, as this was, to sentence for similar

15   offenses concurrently.  That's, generally speaking, what's

16   done.

17             I still have to answer for a sentence that does

18   not exceed what it should be, and not let my own personal

19   emotions, my own personal feelings come into play.  And in

20   doing my job, that's why I have imposed the sentence of

21   75 years.

22             It doesn't in any way diminish the work of the

23   law enforcement officers, the work of the U.S. Attorney's

24   Office, the feelings of the victims here.

25             Mr. Rosenthal, it doesn't in any way take away

1  from your work where you've asked for a sentence of 30 years.
2  That just was not going to happen.  When somebody does that --
3  really, in some ways, what he did to his own child was bad
4  enough.  You know, I have often said that if something happened
5  to a child that was in my care, it would be worse than if it
6  happened to myself, you know, because you just -- at least
7  when I've had children that have come with my own children on
8  play dates or I'm driving them in the car, I felt a heightened
9  sense of responsibility for somebody else's child.  It's the
10  heightened sense because it's somebody else who has entrusted
11  their child to you.

12        And so in many ways what he did to other people's
13  children is -- is worse.  It's worse.  Certainly, his own
14  child, that was pretty bad.  Horrible, horrible, horrible.
15  But it's these other people who have entrusted him with
16  their children, somebody goes over for dinner and he does
17  it to their child.  It's -- it's just -- there just aren't
18  words for it.

19        And his ex-wife, his former wife, when she talked
20  about how horrible -- what she is going through, I can't do
21  justice to what they had to say here.  But in my role in
22  trying to impose a sentence that's fair and appropriate,
23  that's what I have done.  And I've restrained myself from not
24  imposing a higher sentence because I can't impose a life
25  sentence.  It's not available to me.  And I have restrained

1    myself from doing so.

2              The Court, having pronounced sentence, does counsel

3    for the defendant or government have any objections to the

4    sentence or to the manner in which the Court pronounced

5    sentence other than those previously stated for the record?

6              Ms. King?

7              MS. KING:  No, your Honor.

8              THE COURT:  Thank you.

9              Mr. Rosenthal?

10             MR. ROSENTHAL:  Just as previously stated, your

11   Honor.

12             We do have a request for a facility.

13             THE COURT:  And I'll get to that in just a second.

14   Let me just finish this colloquy.

15             The defendant is remanded to the custody of

16   the United States Marshal to await destination by the Bureau

17   of Prisons.

18             Let's see.  I think you have -- what is it, you

19   have an underlying -- I guess it was an underlying information

20   here, is that right?

21             What was it that needs to be dismissed today?

22             MS. KING:  I believe it would be an underlying

23   indictment.

24             THE COURT:  Let's double-check.

25        (Brief pause.)

1              THE COURT:  So what we have is we have the

2    superseding -- and they called it a superseding information.

3    So there must have been -- there was not an original

4    information.  What there was was an original indictment,

5    is that right?

6              MS. KING:  Yes, your Honor.

7              THE COURT:  Okay.  The original indictment is

8    dismissed.  Is that right, Ms. King?

9              MS. KING:  Yes, your Honor.

10             THE COURT:  All right.  Thank you.

11             You have a right to appeal from the judgment and

12   sentence within 14 days from the entry of the judgment.

13   Failure to appeal within the 14-day period shall be a waiver

14   of your right to appeal.

15             The government may file an appeal from this

16   sentence.

17             You are also advised that you're entitled to

18   assistance of counsel when taking an appeal, and if you are

19   unable to afford a lawyer, one will be provided for you.

20             If you are unable to afford the filing fee, the

21   clerk of the court will be directed to accept the notice of

22   appeal without such fee.

23             All right.  Mr. Rosenthal, what are your

24   recommendations now?

25             MR. ROSENTHAL:  Your Honor, after speaking with

1  Mr. Culmo, we are not asking the Court to recommend a specific

2  facility.

3          THE COURT:  Okay.  So I will not recommend a

4  facility to the Bureau of Prisons.

5          Are there any programs?  You know, he has

6  restitution to pay here that will be determined later.  I

7  think he ought to participate in a UNICOR program.  Even

8  though it's a minimal amount of money that's paid to them for

9  doing this work, this is something that he can use to send to

10  victims, and I think he needs to do that.

11          MR. ROSENTHAL:  That's fine as your recommendation,

12  your Honor.  It's our hope that we will be able to extinguish

13  the restitution.

14          THE COURT:  Okay.  All right.  That's fine.

15          Any other recommendations?

16          MR. ROSENTHAL:  No, your Honor.

17          THE COURT:  All right.  Anything else from the

18  government here?

19          MS. KING:  No, your Honor.  Thank you.

20          THE COURT:  All right.  Anything else from the

21  defense?

22          MR. ROSENTHAL:  No, your Honor.  Thank you.

23          THE COURT:  All right.  I want to thank everybody

24  who came in today.  What you did was very -- it's a difficult

25  step, but I think that it's a good step in healing to be able

1    to say these things.  And the same thing for the victims who

2    weren't here who wrote this -- their feelings out on a document

3    that was submitted to the Court.

4                You know, parents, you should absolutely not blame

5    yourself.  It was heart-wrenching to hear what parents said.

6    These people are very clever and they prey on children.  And

7    despite your best efforts, that's what, you know, sometimes

8    happens, and blame does not lie there.

9                For Mr. Culmo, I hope that while you are in prison

10   you can maybe do things to help inmates.  You're highly

11   educated.  There aren't that many people with a college degree

12   in prison, especially in a technical science field like

13   engineering.  Maybe you can use your skills to help other

14   people get an education and try to better their lives and

15   you can come to grips with -- with what occurred here.

16               There are no winners in this kind of case, and

17   hopefully everybody involved can turn the page and move

18   forward.

19               But, Mr. Culmo, you will spend the rest of your life

20   in prison, and that was just necessary due to the circumstances

21   of this case, the need to punish you, the need to separate you

22   from children.

23               So with that, we will end today's proceedings, and

24   we are in recess.

25               I'm just going to stay here, though, for

                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

1    a few minutes.  Thank you.

2                        (Whereupon, the Court adjourned

3                          at 1:15 p.m.)

4                                --oo0oo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2                                    )

3    MIDDLE DISTRICT OF FLORIDA      )

4

5                        REPORTER TRANSCRIPT CERTIFICATE

6

7            I, LORI ANN CECIL VOLLMER, Official Court Reporter

8    for the United States District Court, Middle District of

9    Florida, certify pursuant to Section 753, Title 28, United

10   States Code, that the foregoing transcript is a true and

11   correct transcription of the stenographic notes taken by the

12   undersigned in the above-entitled matter, Pages 1 through 88,

13   and that the transcript page format is in conformance with

14   the regulations of the Judicial Conference of the United States

15   of America.  I further certify that I am not attorney for, nor

16   employed by, nor related to any of the parties or attorneys to

17   this action, nor financially interested in this action.

18                    IN WITNESS WHEREOF, I have set my hand at

19   Tampa, Florida, this 23rd day of June 2025.

20

21                    /s/ Lori Ann Cecil Vollmer

22                    Lori Ann Cecil Vollmer, CSR, RPR
                       United States Court Reporter

23

24

25

                        UNITED STATES DISTRICT COURT
                         MIDDLE DISTRICT OF FLORIDA
                               TAMPA DIVISION